A09A2391, A09A2392. CHRISTIAN v. EAGLES LANDING
CHRISTIAN ACADEMY, INC.; and vice versa.

(692 SE2d 745)

BARNES, Judge.

Coral Christian sued Eagles Landing Christian Academy, Inc. (Eagles Landing), a private school, for injuries sustained during cheerleading practice. The trial court granted summary judgment to Eagles Landing on the ground that Coral had assumed the risk of sustaining an injury, and Coral appeals that finding. Eagles Landing cross-appeals the denial of its summary judgment motion based on the liability waivers signed by Coral and her parents. While a teenager does not assume all risk of injury merely by participating in extracurricular sports, under the unique facts of this case, we affirm the trial court's grant of summary judgment to the school, and do not reach the liability release issue.

1. On appeal we review the trial court's grant of summary judgment de novo to determine whether the evidence, viewed in the light most favorable to the nonmoving party, demonstrates a genuine issue of material fact. Summary judgment is proper only when no issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Preferred Real Estate Equities v. Housing Systems*, 248 Ga. App. 745 (548 SE2d 646) (2001). Further, when ruling on a motion for summary judgment, a court must give the opposing party the benefit of all reasonable doubt, and the evidence and all inferences and conclusions therefrom must be construed most favorably toward the party opposing the motion. *Moore v. Goldome Credit Corp.*, 187 Ga. App. 594, 596 (370 SE2d 843) (1988). On motions for summary judgment, however, courts cannot resolve the facts or reconcile the issues. *Fletcher v. Amax, Inc.*, 160 Ga. App. 692, 695 (288 SE2d 49) (1981). When reviewing the grant or denial of a motion for summary judgment, this court conducts a de novo review of the law and the evidence. *Desai v. Silver Dollar City*, 229 Ga. App. 160, 163 (1) (493 SE2d 540) (1997). Finally, when a defendant moves for summary judgment based on an affirmative defense, such as assumption of the risk, it bears the burden of pointing to evidence establishing that defense. *Cleaveland v. Gannon*, 288 Ga. App. 875, 880 (655 SE2d 662) (2007).

The record includes the depositions of Coral, her mother and father, her cheerleading coach Beth Etheridge, another cheerleading coach Cynthia Hunter, and the school's corporate representative Michelle Holland, who is an administrative assistant and as of 2006 the school's "cheer director." Of these, only Coral, her mother, Coach Etheridge, and Coach Hunter were present when Coral was injured on October 13, 2005, during her cheerleading squad's warmup before a football game, and only Coral and Etheridge saw the stunt.

Construing the evidence most favorably toward Coral, as we must, the record shows that Coral was an accomplished, experienced cheerleader. She became involved with gymnastics in kindergarten and joined Cheerstars in sixth grade, a program not affiliated with a school. She began learning and performing stunt routines in Cheerstars, including the "extended liberty," the stunt she was practicing when she was injured. To perform this stunt, two "base" cheerleaders lift a "flier" into the air on one leg, supporting her foot with their hands with their arms outstretched over their heads. The flier dismounts by falling backward with her arms straight out, her elbows bent 90 degrees, and her legs and torso in a pike position forming a V shape. The bases catch her hips and legs, almost in a sitting position, and the back spotter keeps her head and shoulders from hitting the ground.

Coral was always the flier, the highest position, and she estimated she performed at least 100 extended liberties in sixth grade. In seventh grade she joined the junior varsity football cheerleading squad and the competition squad at Eagles Landing, and also joined another outside organization called United Cheerleading. During that school year she attended some sort of cheerleading activity almost daily, and during the summer before eighth grade she attended a cheerleading camp conducted by the Christian Cheerleading Association. In eighth and ninth grades Coral made the football and competition cheerleading squads, and between eighth and ninth grades attended another cheerleading camp. She performed at least 500 extended liberties before she became injured.

Coral was injured on October 13, 2005, when she was 14 and in the ninth grade. School let out at 3:00 p.m., and Coral's competition squad performed a routine for the parents around 3:45. At 4:30 her football squad, which included the same girls as the competition squad, met at the football field and their coach, Beth Etheridge, instructed them to warm up and stretch. Coral did not remember if the coach gave them any further instructions. The girls saw Coach Etheridge walk up toward the stands about 40 yards away, which Coral did not think "really phased [sic] us" because the girls were just doing what the coach told them to do. Coral admitted she was aware of a rule not to do any stunting without a coach present, and when asked how that rule related to warmups, replied, "I don't know, I just think that we were a bunch of kids and we really didn't care about the rules to begin with, except for like safety."

About two minutes into the warmup, the squad practiced one stunt and then began practicing the extended liberty. When asked how the injury occurred, Coral replied, "I just kind of remember going up and then I came down and no one caught me, except for my feet were up in the air, and I thought my back had popped." Her feet

never left anyone's hands, she thought. She "honestly couldn't tell" how she fell, and while she did not think it was anyone's fault she fell, she concluded she could not have had a broken arm if the back spotter had caught her. She did not know where the back spotter was standing when she fell, but no one was there to catch her so she put her arm out so she would not break her neck, she said, and her right arm was the first thing to touch the ground. Coach Etheridge and Coach Hunter came over immediately, as did Coral's mother, who had been in the stands, and discovered that Coral had suffered a compound fracture. The school trainer splinted Coral's arm, then they moved her to the front of the school where an ambulance picked her up. She underwent five surgical procedures and a lengthy course of physical therapy over the next two years.

Etheridge testified that she gave the squad permission to go to the end zone and warm up with a relatively easy banner stunt. They warmed up and performed the stunt, then while waiting for the game to begin they took it on themselves to perform an extended liberty, which they were going to perform during half-time and which was the most difficult stunt they did. Etheridge was in the "cheer arena" in front of the stands and the squad was about 40 yards away, within her sight and hearing and within range to intervene with a verbal command.

Coral's stunt team had practiced together a lot, had performed in competition, and was a very strong, sound group. The back spotter was very attentive and also very tall, which was good because the taller the spotter, the more control she had in catching the flier. Etheridge's daughter, who was the team captain, led the warmups and "took part in the decision to perform the extended liberty," although she had no authority to direct the squad to do so.

Etheridge saw the stunt go up, but could not yell at them while they were stunting because that could distract them and cause injury that otherwise might not occur. The group did not collapse at the end of the stunt, nor did Coral's body hit the ground, and "nothing looked amiss," but apparently Coral's arm took the brunt of the fall.[1] The squad put Coral on the ground after stopping the fall and did not realize she was injured until she tried to get up. When Etheridge saw squad members running toward her she immediately went to Coral and saw the broken bone in her arm.

2. Coral contends the trial court erred in holding as a matter of law that she assumed the risk of her injuries. Assumption of risk is

---

[1] While Etheridge testified that the other squad members told her Coral had lost her balance and fallen diagonally between the main base and the back spotter, that evidence is inadmissible hearsay. The only explanation proper for the injury is Coral's testimony that when she fell, the back spotter was not there to catch her.

a complete defense to negligence, and requires that the plaintiff have actual knowledge of the danger, understand the risk, and voluntarily expose herself to it. *Vaughn v. Pleasent*, 266 Ga. 862 (471 SE2d 866) (1996). The plaintiff must know about the specific risk that caused her injuries, and the defense ordinarily presents a jury question. *Prillaman v. Sark*, 255 Ga. App. 781, 782 (567 SE2d 76) (2002). It "assumes that the actor, without coercion of circumstances, chooses a course of action with full knowledge of its danger and while exercising a free choice as to whether to engage in the act or not. [Cit.]" *Young v. Brandt*, 225 Ga. App. 889, 892 (485 SE2d 519) (1997).

While certainly a teenager does not assume all risk by engaging in extracurricular sports activities (see *Prillaman v. Sark*, supra, 255 Ga. App. 781), under the unique facts of this case the trial court did not err in holding that Coral assumed the risk here as a matter of law. Coral had been cheering for a long time, always in the highest, riskiest position. She knew that falling was a possibility when doing a cheerleading stunt, and in fact had fallen "out of the move" 20 to 25 times before while doing an extended liberty, although she had never hit the ground. She had injured her knee while stunting in seventh grade and knew that cheerleading was risky and injury was possible. Other team members had been hurt before; one had even been dropped and injured her neck doing a similar stunt. She testified that she did not really care about the rules, except safety rules, and despite having concerns about the ability of her back spotter and knowing the squad was not supposed to perform the extended liberty without her coach present, she joined the unanimous decision to do it anyway.

Coral argues that her coach's position 40 yards away violated a rule by the American Association of Cheerleading Coaches & Advisors (AACCA), which provides that the coach must always be physically present, able to see and hear the activity, and capable of intervening. Coral testified that if her coach had been present she could have prevented the injury because if she had seen Coral falling, she "could have came [sic] and grabbed me," although she also admitted that the coaches were not always around each stunt group when they were performing their routines. The coach admits that she was not close enough to step into the stunt and catch Coral herself because the squad was just going to warm up. The coach explained that when the girls were learning a new stunt, she stood right next to them, made sure they were all in proper position, and had them practice over and over until they had the moves down perfectly. They went through "skills progressions" in which they gradually learned and mastered each step in a stunt, but once they learned the routine and were about to perform it in public, the coach

did not serve as a spotter. But before a performance, the coach testified, she was not teaching them new skills but determining whether they were in the proper mindset to perform. The team was given permission to go warm up, and took it upon themselves to practice the extended liberty stunt without permission and without the coach standing within arms' length.

Unlike the situation in *Prillaman*, in which we reversed the grant of summary judgment to the defendants in a case where the plaintiff cheerleader was injured while the group was performing a new stunt on asphalt in violation of AACCA rules, 255 Ga. App. at 781-782, here Coral knew the stunt well, having performed it at least 500 times. Her coach did not encourage the team to practice the stunt on their own; in fact, they knew they were not supposed to do so. "[S]tudents playing or practicing such games may injure themselves or each other," despite reasonable precautions. *Hale v. Davies*, 86 Ga. App. 126, 129 (70 SE2d 923) (1952); see also *Young v. Brandt*, supra, 225 Ga. App. 889.

3. Based on the foregoing, we need not reach Eagles Landing's cross-appeal arguing that the trial court erred in holding that Coral and her parents did not waive their right to sue for negligence by signing a liability release form.

*Judgment affirmed. Miller, C. J., and Andrews, P. J., concur.*

DECIDED MARCH 24, 2010.

*Childers, Schlueter & Smith, William A. Parker, Jr., Larry T. Wilson*, for appellant.

*Goodman, McGuffey, Lindsey & Johnson, Joshua S. Stein, Ted N. Echols*, for appellee.